Filed 11/18/22; Certified for Publication 12/12/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| AMERICAN CHEMISTRY COUNCIL et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> DEPARTMENT OF TOXIC SUBSTANCES CONTROL et al., <br><br> Defendants and Appellants. | F082604 <br><br> (Super. Ct. No. 19CECG02938) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Ana I. de Alba, Judge.

Sidley Austin, Sean A. Commons, Paul J. Zidlicky and Joseph T. Zaleski for Plaintiff and Appellant American Chemistry Council.

Atkinson, Andelson, Loya, Ruud & Romo, Brian M. Wheeler and Andrew M. Aller for Plaintiff and Appellant General Coatings Manufacturing Corp.

Rob Bonta, Attorney General, Edward H. Ochoa, Assistant Attorney General, Sarah E. Morrison, Catherine M. Wieman and Lani M. Maher, Deputy Attorneys General, for Defendants and Appellants.

-ooOoo-

This case involves an appeal and cross-appeal following the trial court's determination that the Department of Toxic Substances Control (the Department) acted within its authority and properly complied with the California Administrative Procedure Act (APA; Gov. Code, § 11340 et seq.) but violated the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) when it enacted a regulation listing spray polyurethane foam systems containing unreacted methylene diphenyl diisocyanates (spray foam systems) as a priority product under California's "Green Chemistry" law (Health & Saf. Code, §§ 25251–25257.2) (the listing regulation).[1]  Appellants in this case, American Chemistry Council (ACC) and General Coatings Manufacturing Corp. (General Coatings), challenge the Department's actions on two grounds.  First, that listing spray foam systems as a priority product was in excess of the Department's authority under the Green Chemistry law and its enacting regulations, the Safer Consumer Products regulations.  Second, that the Department violated the APA in multiple ways when enacting the listing regulation.  The Department raises a separate issue in its cross-appeal that challenges the trial court's determination that it violated CEQA.  The Department argues the trial court's ruling was incorrect, but also that the claim should have been deemed untimely under CEQA's statute of limitations.  For the reasons set forth below, we affirm the trial court's determination that the Department acted within its authority and within the requirements of the APA when it enacted the listing regulation.  We then reverse the trial court's finding of a CEQA violation on the ground that the claim was untimely under the statute of limitations.

**OVERVIEW OF THE GREEN CHEMISTRY LAW AND THE SAFER COMSUMER PRODUCTS REGULATIONS**

Given the importance of the Green Chemistry law and the Safer Consumer Products regulations to both the overall understanding of the factual record and many of

---

[1]      Named as a defendant with the Department is its Director, Meredith Williams.

the core issues in this case, we begin by summarizing both the law and the regulatory structure.

Overview of the Green Chemistry Law

In 2008, article 14, the Green Chemistry law, was added to chapter 6.5 of division 20 of the Health and Safety Code, the chapter on Hazardous Waste Control. (See Health & Saf. Code, §§ 25251–25257.2, added by Stats. 2008, ch. 560, § 1.) Although amended throughout the years, the statutory scheme itself remains relatively sparse. It consists of definitions, two statutes providing guidance for and authorizing additional regulations, an evaluation process for generating those regulations, the establishment of a green ribbon science panel and toxic information clearinghouse, protections for trade secrets disclosed in connection with the statutory scheme's goals, boundaries on the authority granted to regulate hazardous waste, and a later-added set of statutory guidelines for a healthy nail salon recognition program.

Relevant to the issues in this appeal, the statutes contain one definition related to the core functions of the law. In this definition, "consumer product" is defined to mean "a product or part of the product that is used, bought, or leased for use by a person for any purposes." (Health & Saf. Code, § 25251, subd. (e).) The definition then excludes any "dangerous drug or dangerous device" under section 4022 of the Business and Professions Code, "[d]ental restorative materials" under section 1648.20, subdivision (b) of the same code, any "device" as defined in section 4023 of the same code, any "food" as defined in section 109935, subdivision (a) of the Health and Safety Code, the packaging associated with several of these products, and any "pesticide" as defined under a certain federal law. (Health & Saf. Code, § 25251, subd. (e)(1)–(6).)

As noted, the statutory scheme includes two core authorizations for further regulatory actions. The first requires the Department to adopt regulations "to establish a process to identify and prioritize those chemicals or chemical ingredients in consumer products that may be considered as being a chemical of concern." (Health & Saf. Code,

3.

§ 25252, subd. (a).)  These regulations must "establish an identification and prioritization process that includes, but is not limited to," three considerations:  (1) the "volume of the chemical in commerce in this state"; (2) the "potential for exposure to the chemical in a consumer product"; and (3) the "[p]otential effects on sensitive subpopulations, including infants and children."  (Health & Saf. Code, § 25252, subd. (a)(1)–(3).)  In developing the regulations, the Department must also "develop criteria by which chemicals and their alternatives may be evaluated," including "traits, characteristics, and endpoints" as included in the clearinghouse aspects of the statutory scheme.  (Health & Saf. Code, § 25252, subd. (b)(1).)

The second authorization for regulatory action requires the Department to adopt regulations "that establish a process for evaluating chemicals of concern in consumer products, and their potential alternatives, to determine how best to limit exposure or to reduce the level of hazard posed by a chemical of concern."  (Health & Saf. Code, § 25253, subd. (a)(1).)  As part of these regulations, the Department must "establish a process that includes an evaluation of the availability of potential alternatives and potential hazards posed by those alternatives, as well as an evaluation of critical exposure pathways" and include life cycle assessment tools that consider at least 13 identified factors such as product function or performance, public health impacts, and economic impacts.  (Health & Saf. Code, § 25253, subd. (a)(2).)  Finally, the regulations developed in this area must "specify the range of regulatory responses that the [D]epartment may take following the completion of the alternatives analysis," including "[n]ot requiring any action," "[i]mposing requirements to provide additional information needed to assess" chemicals of concern and their alternatives, imposing labeling requirements or restrictions on use, "[p]rohibiting the use of the chemical of concern in the consumer product," and requiring funding for "green chemistry challenge grants where no feasible safer alternative exists," among others.  (Health & Saf. Code, § 25253, subd. (b).)

To the extent the statutory scheme contains any indication of the overall goals of the new regulatory scheme, those are contained in the statute defining the role of the green ribbon science panel.  There, the panel is authorized to advise on "matters in support of the goals of this article," which are described as "significantly reducing adverse health and environmental impacts of chemicals used in commerce, as well as the overall costs of those impacts to the state's society, by encouraging the redesign of consumer products, manufacturing processes, and approaches."  (Health & Saf. Code, § 25255, subd. (a).)

Finally, the statutory scheme includes limitations on the newly granted authority by noting the statutes may not limit any other agency's "existing authority over hazardous materials" and that the statutes do "not authorize the [D]epartment to supersede the regulatory authority of any other department."  (Health & Saf. Code, § 25257.1, subds. (a), (b).)  Further, the statute prevents duplicating or adopting conflicting regulations "for product categories already regulated or subject to pending regulation consistent with the purposes of this article."  (Health & Saf. Code, § 25257.1, subd. (c).)

Overview of the Safer Consumer Products Regulations

The regulations ultimately adopted to implement the Green Chemistry law are called the Safer Consumer Products regulations.  (See Cal. Code Regs., tit. 22, § 69501 et seq.)[2]  The regulations state they specify the "process for identifying and prioritizing Priority Products and their Chemicals of Concern, and identifying and analyzing alternatives to determine how best to eliminate or reduce potential exposures to, or the level of potential adverse impacts posed by, the Chemical(s) of Concern in Priority Products."  (Tit. 22, § 69501, subd. (a).)

---

[2]     Further references to title 22 are to title 22 of the California Code of Regulations.

At a general level, and as applicable to this case, the regulations set forth a four-step process for identifying and regulating priority products and their chemicals of concern.[3]  These steps are:  (1) to identify candidate chemicals (see tit. 22, §§ 69502–69502.3); (2) to identify and prioritize products containing candidate chemicals (see tit. 22, §§ 69503–69503.7); (3) to have responsible parties submit alternatives analysis reports for priority products (see tit. 22, §§ 69505.1–69505.9); and (4) to utilize those reports to identify and implement regulatory responses for priority products (see tit. 22, §§ 69506–69506.10).  Although this case focuses primarily on issues relating to the second step, we provide a fuller summary of the regulations for context.

### *Identifying Candidate Chemicals*

Candidate chemicals are those chemicals that are considered to be "a candidate for designation as a Chemical of Concern" under the regulatory scheme.  (Tit. 22, § 69501.1, subd. (a)(19).)  The list of these chemicals is derived either through reference to lists created by other identified national and international bodies or through an independent evaluation by the Department that considers enumerated adverse impacts, particularly on sensitive subpopulations, and both potential and actual exposure to the chemical in question.  (See tit. 22, § 69502.2.)

As used throughout the regulations, "adverse impacts" are defined as "adverse public health impacts and/or adverse environmental impacts."  (Tit. 22, § 69501.1, subd. (a)(5).)  Each of these two subcategories of adverse impacts are regulatorily defined to include additional subcategories, which themselves may include other definitions.  For example, adverse environmental impacts include five enumerated impacts, including adverse air quality impacts.  (Tit. 22, § 69501.1, subd. (a)(4)(A).)  "Adverse air quality impacts" are defined to mean "indoor or outdoor air emissions of any of the air

---

[3]     Both the terms "priority product" and "chemical of concern" are defined by the regulations.  (See tit. 22, § 69501.1, subd. (a)(21), (53).)  These definitions, and others relevant to the court's analysis, will be noted or discussed as necessary when they arise.

contaminants listed below that have the potential to result in adverse public health, ecological, soil quality, or water quality impacts." (Tit. 22, § 69501.1, subd. (a)(2).) The regulations then list seven categories of air contaminates, which reference other internal and external regulations and include additional identifications of eight greenhouse gases. (Tit. 22, § 69501.1, subd. (a)(2)(A)–(G).)

"Adverse public health impacts" are defined to mean "any of the toxicological effects on public health specified in article 2 or article 3 of chapter 54, or exceedance of an enforceable California or federal regulatory standard relating to the protection of public health," and public health "includes occupational health." (Tit. 22, § 69501.1, subd. (a)(6).) Articles 2 and 3 of chapter 54 refer to the regulations defining hazard traits considered under the related statutory authority creating a toxic information clearinghouse. These traits include such things as a chemical's carcinogenicity, developmental and reproductive toxicity, and dermatoxicity. (See tit. 22, § 69401 et seq.)

*Identifying Priority Products*

Once the list of candidate chemicals has been created, the regulations require the Department to "identify and prioritize products containing Candidate Chemicals." (Tit. 22, § 69503.) Such products include any "products that contain one or more Candidate Chemicals and that are placed into the stream of commerce in California." (Tit. 22, § 69503.1.) Those products of highest concern are deemed priority products and the list of such products is required to be established and updated through rulemaking under the APA. (Tit. 22, §§ 69503.2, 69503.5, subd. (a).)

The process for prioritizing products and creating the priority products list is set out within the regulations and guided by two "Key Prioritization Principles": (1) there "must be potential public and/or aquatic, avian, or terrestrial animal or plant organism exposure to the Candidate Chemical(s) in the product"; and (2) there "must be the potential for one or more exposures to contribute to or cause significant or widespread adverse impacts." (Tit. 22, § 69503.2, subd. (a).)

The regulations explain that whether a product is determined to be a high priority turns on "an evaluation of the product-chemical combination to determine its associated potential adverse impacts, potential exposures, and potential adverse waste and end-of-life effects" using factors for which "information is reasonably available." (Tit. 22, § 69503.2, subd. (b).) The types of adverse impacts and exposures considered are separately listed in title 22, section 69503.3. For adverse impacts, seven factors are enumerated, such as the chemical's hazard traits, aggregate effects, cumulative effects with other chemicals, physicochemical properties, environmental fate, and potential to degrade, along with the populations which may be impacted by the chemical. (Tit. 22, § 69503.3, subd. (a)(1)(A)–(G).) For exposures, four factors are enumerated, with some having additional subparts. These are: (1) the product's market presence, as identified through sales by volume and number of units, as well as intended product use and targeted customers; (2) the occurrence or potential occurrence of exposure to the chemical in the product; (3) the household and workplace presence of the product; and (4) potential exposures to the chemical in the product's life cycle, including among other factors the "[f]requency, extent, level, and duration of potential exposure for each use scenario and end-of-life scenario." (Tit. 22, § 69503.3, subd. (b).)

In addition to these factors, the regulations consider "the scope of other California State and federal laws … under which the product or the Candidate Chemical(s) in the product is/are regulated and the extent to which these other regulatory requirements address, and provide adequate protections with respect to the same potential adverse impacts and potential exposure pathways, and adverse waste and end-of-life effects, that are under consideration as a basis for the product-chemical combination being listed as a Priority Product." (Tit. 22, § 69503.2, subd. (b)(2).) Where a product is already regulated "with respect to the same potential adverse impacts and potential exposure pathways …, the Department may list such a product-chemical combination as a Priority Product only if it determines that the listing would meaningfully enhance protection of

8.

public health and/or the environment with respect to the potential adverse impacts, exposure pathways, and/or adverse waste and end-of-life effects that are the basis for the listing." (*Ibid.*) Finally, in its discretion, the regulations permit the Department to consider "whether there is a readily available safer alternative that is functionally acceptable, technically feasible, and economically feasible." (Tit. 22, § 69503.2, subd. (b)(3).)

Based on this analysis, a priority products list is created. For each proposed priority product, the Department must provide a "description of the product-chemical combination that is sufficient for a responsible entity to determine whether one or more of its products is a Priority Product" and identify the "Candidate Chemical(s) that is/are the basis for the product being listed as a Priority Product," along with their hazard traits and environmental or toxicological endpoints. (Tit. 22, § 69503.5, subd. (b)(1)(A), (2)(A).) In addition, the Department must provide the "due date for submission of the [p]reliminary [alternatives analysis r]eport" required by the regulations. (Tit. 22, § 69503.5, subd. (b)(3)(A).)

*Requiring Alternatives Analysis Reports*

Once a product-chemical combination is added to the priority products list, a series of regulatory requirements are imposed on responsible entity parties, with a "responsible entity" being defined as a manufacturer, importer, assembler, or retailer of the priority product. (Tit. 22, § 69501.1, subd. (a)(60).) The ultimate obligation is the submission of an alternatives analysis report for the priority product. (Tit. 22, § 69505.1, subd. (b).) However, the submission of this report may not be required if the manufacturer takes one of two types of action.

First, the manufacturer may remove the chemical of concern from the stream of commerce. This can be done by providing one of three notices in a manner that complies with the regulations. These options are a "Chemical Removal Intent," a "Product Removal Intent," or a "Product-Chemical Replacement Intent" notice. (Tit. 22,

9.

§ 69505.2, subd. (a)(1)(A).) Notably, if only a removal notice is provided, and a subsequent confirmation notice is not timely submitted, a preliminary alternatives analysis report, or similar report, must still be submitted. (Tit. 22, § 69505.2, subd. (a)(1)(B).)

Second, if the Department has decided to identify an alternatives analysis threshold, a manufacturer may submit an alternatives analysis threshold notification certifying its product does not exceed the alternatives analysis threshold set by the Department. (Tit. 22, § 69505.3, subd. (a)(1)–(4).) An "alternatives analysis threshold" is a discretionarily set "concentration for any Chemical of Concern that is an intentionally added ingredient" to a priority product. (Tit. 22, § 69503.5, subd. (c).) The threshold is defined as either the "Practical Quantitation Limit for a Chemical of Concern that is present in a Priority Product solely as a contaminant" or the "applicable concentration, if any, specified by the Department." (Tit. 22, § 69501.1, subd. (a)(12).) The "practical quantitation limit" for a chemical is itself defined as "the lowest concentration of a chemical that can be reliably measured within specified limits of precision and accuracy using routine laboratory operating procedures." (Tit. 22, § 69501.1, subd. (a)(52).)

If neither of these conditions are met, a two-stage alternatives analysis report is required under the regulations. (See tit. 22, § 69505.4, subd. (a).) In the first stage, the responsible entity must (1) identify the product requirements and functions of the chemicals of concern, (2) identify alternatives, (3) identify factors relevant for a comparison of those alternatives, (4) provide an initial evaluation and screening of alternative replacement chemicals, (5) consider any additional pertinent information relevant to the goals of the alternatives analysis, and (6) submit a preliminary alternatives analysis report. (Tit. 22, § 69505.5, subds. (a)–(f).) Each of these individual steps are governed by regulations setting forth the manner and extent to which each must be conducted. (See *ibid*.) However, if in the process of conducting the first five steps a responsible entity "determines a functionally acceptable and technically feasible

alternative is not available," they may, in compliance with additional regulatory requirements, submit "an [a]bridged [alternatives analysis r]eport in lieu of the [p]reliminary and [f]inal [alternatives analysis r]eports." (See tit. 22, § 69505.4, subd. (b).)

An abridged alternatives analysis report, if acceptable, allows the responsible entity to complete the first five steps preceding the completion of a preliminary alternatives analysis report and the first step leading to a final alternatives analysis report in one initial report. (Tit. 22, § 69505.4, subd. (b)(1)–(2).) Recognizing that additional regulatory action will be taken, the responsible entity must also include "an implementation plan" for "proposed regulatory responses" (tit. 22, §§ 69505.4, subd. (b)(4)) including, at a minimum, providing information to consumers (tit. 22, 69506.3) and either initiating "a research and development project" or funding "a challenge grant" that seeks to speed the implementation or use of a safer alternative to the Priority Project in one of four enumerated ways (tit. 22, § 69506.8).

Where an abridged alternatives analysis report is not proper, and once a preliminary alternatives analysis report is approved by the Department, a second, five-step stage is required for analyzing any alternative chemicals still under consideration. (Tit. 22, § 69505.6.) In this stage, the responsible entity must again (1) identify factors relevant for comparing alternatives, (2) compare the priority product and alternatives, (3) consider any other pertinent information, (4) "select the alternative(s) that will replace the Priority Product, unless the decision is to retain the existing Priority Product," and (5) submit a final alternatives analysis report to the Department for approval. (Tit. 22, § 69505.6, subds. (a)–(e).) The content of both the preliminary and final alternatives analysis reports are subject to extensive additional regulations regarding the required scope and content of those reports. (Tit. 22, § 69505.7.)

11.

*Implementing Regulatory Responses*

Ultimately, the process moves toward implementation of a regulatory response regarding the priority product. Under the regulations, the Department "shall identify and require implementation of one or more regulatory responses for Priority Products and/or selected alternative products when the Department determines such regulatory responses are necessary to protect public health and/or the environment." (Tit. 22, § 69506, subd. (a).) The Department is instructed to "give preference to regulatory responses providing the greatest level of inherent protection," meaning, "avoidance or reduction of adverse impacts … that is achieved through the redesign of a product or process, rather than through administrative or engineering controls designed to limit exposure to, or the release of, a Chemical of Concern or replacement Candidate Chemical in a product." (Tit. 22, § 69506, subd. (b).)

The regulations provide for several potential responses including providing information to consumers, imposing use restrictions on products, prohibiting sales, engineering safety measures or imposing administrative controls on accessing products, defining end-of-life management requirements, and requiring further research on potential alternatives. (Tit. 22, §§ 69506.3–69506.8.) Exemptions are permitted to the regulations, but only where the response conflicts with or duplicates other regulatory programs. (Tit. 22, § 69506.9, subd. (b)(6).)

*Resolving Disputes*

Throughout the regulatory process, the Department provides opportunities for affected responsible entities to dispute decisions made by the Department. (Tit. 22, § 69507.) Subject to some irrelevant exceptions, the regulations first require use of an informal dispute resolution procedure that must be started within 30 days of the decision subject to dispute and is expected to be resolved within 30 days of initiating the dispute. (Tit. 22, § 69507.1.) If informal dispute resolution fails, an affected responsible entity may then file an appeal to the director of the Department (the director). (Tit. 22,

§ 69507.2.) This appeal must be filed within 30 days of the resolution of the informal dispute procedure and should be resolved within 60 days of the appeal being filed. (Tit. 22, § 69507.2, subds. (b)–(c).)

## FACTUAL AND PROCEDURAL BACKGROUND

As mentioned, this case revolves around the regulatory decision to list spray foam systems as a priority product. Spray foam systems were initially identified as a potential priority product in March 2014. As part of the process for finalizing spray foam systems as a priority product under the regulations, the Department drafted multiple documents over several years detailing findings relevant to the listing regulation. These documents are contained in the administrative record and provided support for the initial statement of reasons and final statement of reasons released by the Department as part of the standard regulatory process. With respect to issues discussed below, these documents include a 2017 "Summary of Technical Information and Scientific Conclusions for Designating Spray Polyurethane Foam Systems with Unreacted Methylene Diphenyl Diisocyanates as a Priority Product" (Technical Summary), a 2018 "Economic and Fiscal Impact Statement" (Economic Assessment), and a 2018 "California Environmental Quality Act Notice of Exemption" (Exemption Notice). We begin by summarizing these three documents.

*The Technical Summary*

The Department's Technical Summary was drafted "to present the scientific information the Department … relied on to identify and prioritize spray polyurethane foam … systems containing unreacted methylene diphenyl diisocyanates (MDI) for listing as a Priority Product." With relevant citations to scientific references, the first part of the Technical Summary, titled Executive Summary, explains that isocyanates are chemicals known to "elicit an immune response known as respiratory sensitization" which "can lead to an elicitation of asthma in subsequent exposures to isocyanates, even when exposures are very low." "[I]t is generally accepted that isocyanates, including

13.

MDI, are asthmagens … and are associated with work-related asthma." In data from 1993 through 2008, the California Work-Related Asthma Prevention Program "recorded 47 cases of work-related asthma associated with isocyanate exposure, with eight cases specifically attributed to MDI exposure."

Inhalation of MDI "during and soon after application" of spray foam systems is identified as a "particular concern" based in part on the fact that "MDI-induced fatalities have been documented for workers using spray polyurethane paints … and resins containing MDI." Exposure "may occur with use of either high- or low-pressure [spray foam] systems, including home use kits." While certain workers have been found to have exposures that exceed the threshold limit values set by the American Conference of Governmental Industrial Hygienists and/or the permissible exposure limits of the California Division of Occupational Safety and Health Administration, studies "also suggest[] that exposure to very low concentrations of MDI can trigger adverse reactions in previously sensitized individuals." Although engineering controls, such as personal protective equipment (PPE), can be effective in reducing exposure, several factors make PPE use unreliable to the point that estimates suggest "only about 64 [percent] of construction workers wear proper PPE on a regular basis"

With respect to what are known as high-pressure spray foam systems, "industry recommended engineering and administrative controls and use of PPE reduces the likelihood of exposure, but cannot eliminate worker exposure to MDI during spraying." Aerosolized exposure "in the workers' breathing zone" exists throughout "the entire work shift," and additional exposure may occur "through accidental spills or leaks, cleaning and maintenance of the equipment … [or f]ailure to use …, improper use of, imperfect fit or malfunction of PPE."

Other types of systems, known as low-pressure systems, are "used by insulation contracting businesses, including those with employees … and sole proprietors, and by individual consumers" and are "exempt from federal … and [state] requirements." There

14.

is "[l]imited data" suggesting that such systems generate "less airborne MDI" but, "in several studies, measurable MDI was detected around applicators' breathing zones during application." Use of such systems is particularly concerning "because [users] are unlikely to use engineering controls and PPE or industry recommended administrative controls."

Based on these findings, the Executive Summary explains that applying spray foam "through high- and low-pressure systems, including home use [spray foam] kits, has the potential to cause significant or widespread adverse impacts to human health" including "not only workers of highly specialized commercial operations" but also "any applicator who is either improperly protected or unprotected against MDI exposures such as sole proprietors and individual consumers in California."

Following this part, the Technical Summary contains six more parts supporting the Executive Summary's statements. The first four parts define the nature of the identified priority product and chemicals of concern, including those chemicals' hazard traits and environmental impacts. The other two parts discuss the exposure potential to humans and impacts on sensitive populations.

Although the document discusses both high- and low-pressure spray foam systems, it explains that products of both types share a common feature in the fact that they utilize two separate containers, one holding pure MDI and the other holding materials to combine with the MDI, and mix the contents of those containers together in order to spray out a foam. Although identified generally as MDI, the chemicals of concern are "isocyanates that are referred to as 4,4'-MDI or pure MDI …, generic MDI, and technical grade MDI, all of which contain 4,4'-MDI." MDI is listed, classified, or identified by multiple national and international agencies that track potentially harmful chemicals.

MDI is "a respiratory sensitizer and generally considered as an asthmagen … associated with work-related asthma .… Once sensitized, re-exposure to even low

15.

concentrations of MDI … may trigger severe asthma attacks in some people."  The Technical Summary reviews several studies relating to isocyanates generally, and MDI specifically, focusing on allergic sensitization and respiratory toxicity issues in humans and animals supporting this conclusion.  The Technical Summary then discusses how MDI may exist in the environment, including its susceptibility to discharge in the air, water, and soil.  In the discussion of air discharge, the Technical Summary notes that "airborne concentrations of MDI are expected to be negligible" once the spray foam has cured but that the product "can undergo thermal degradation and release toxic chemicals" even after that point.

With respect to the exposure potential to MDI in spray foam systems, the Technical Summary first summarizes the market presence of the proposed priority product, noting that the total market exceeds a billion dollars and is expanding, that there are at least 38 California contractors listed as members of the Spray Polyurethane Foam Alliance, that the estimated market in California is between $55 and $60 million, and that use of spray foam systems in California is increasing based on energy conservation incentives to the point that in one county, all newly constructed homes are being insulated entirely with spray foam systems.

The Technical Summary then discusses various exposure routes to MDI, including inhalation when a product is sprayed.  In such circumstances, even "when MDI concentrations were maintained below [regulated limits], studies suggest[] that applicators should still use PPE to protect themselves from potentially harmful exposures."  Reviewing monitoring studies, the Technical Summary explains there have "not been many monitoring studies conducted to measure airborne concentrations of MDI during" spray foam applications, although it reviews some known studies.  Based on this, the Technical Summary focuses on known fatalities and occupational asthma data related to isocyanate exposure in other fields.

When it comes to non-occupational exposure points, the Technical Summary notes that "over 50 [spray foam] products containing MDI" are "readily available to consumers" and that 7.7 percent of the U.S. population suffer from asthma. However, the Technical Summary concedes there is limited data on non-occupational exposure. The report concludes that although there is little data, there is no dispute that isocyanates "are sensitizers and potent asthmagens" and "no evidence that exposure to MDI at non-occupational settings [is] safe and do[es] not cause asthma."

The Technical Summary next reviews sensitive subpopulations. The "population subgroups of greatest concern" are identified as "commercial operators using high- and/or low-pressure [spray foam] systems employing only lower tiers of protection, unprotected workers in any commercial businesses, sole proprietors, and individual consumers who purchase [spray foam] systems for various do-it-yourself projects." The summary notes that workers "may be susceptible to both acute and chronic exposure," that isocyanates are "recognized as a cause of occupational asthma," that training for some workers exists but there is little evidence that "applicators who are exempt from state and federal worker protection standards" receive that training, that regardless of training accidental spills, leaks, and cleaning, along with poor or no use of PPE may still result in exposure, that the general public may purchase products without any safety information or proper PPE, and that no current monitoring program exists for protecting workers from exposure to isocyanates. Any exposure was of particular concern because sensitized employees can "not reverse or cure the allergic sensitization that has already occurred."

Based on all these findings, the Technical Summary "conclude[s] that workers, consumers, and bystanders could be exposed to MDI during the use of either high-pressure or low-pressure [spray foam] systems that contain MDI" and that these "exposures have the potential to contribute to or cause significant or widespread adverse impacts on the health of a considerable number of people in the State of California."

*The Economic Assessment*

As part of the APA requirements for the proposed regulation listing spray foam systems as a priority product, the Department created the Economic Assessment discussing the economic impacts of the proposed listing. Focusing on the requirement that spray foam system manufacturers would be required to submit reports following the listing, the Economic Assessment states there are "17 [spray foam] systems manufacturers located throughout the U.S. that could be impacted" by the regulation, with individual estimated costs of between $62,800 and $182,800 and total costs between $1,067,600 and $3,107,600.

The Department concluded, in part through surveys with the known manufacturers, that spray foam systems are "likely the first product that will result in manufacturers conducting [a]bridged [alternatives analysis]" reports. In its own research, the Department concluded such reports would cost between $48,000 and $78,000 to complete, but ultimately accepted industry estimates of $50,000 to $150,000. Notably, industry estimates for a full alternatives analysis report are between $120,000 and $250,000. The remaining cost estimates came from additional paperwork required by the regulations and Department review time.

The Department also looked at potential benefits and costs of the proposed regulation. For benefits, the Department noted that the primary goal of its regulatory process is "to protect public health" by evaluating ways to make spray foam systems safer for consumers and workers. The Department stated this goal could cause manufacturers to realize "financial benefits from increased product sales, reduced employee health and safety costs, and reduced workers' compensation claims." Employers, workers, and consumers could also benefit from "reduced medical costs, lower incidence of debilitation chronic conditions, and less need for [PPE] or specialized safety training."

The Department also felt that the expected use of abridged alternatives analysis reports would further benefit manufactures because "it allows the continued sale and use of the Priority Product on the condition" that manufacturers provide proper data, fund research projects, and take steps to protect consumers. The Department could not, however, fully identify potential benefits because the requirement that manufacturers identify proposed regulatory responses meant it could not "predetermine the actions that [spray foam] manufacturers would need to take, either individually or collectively, to improve consumer product information and advance green chemistry or green engineering principles."

With respect to costs, in addition to the actual figures calculated, the Department looked at the number and types of businesses affected, the number of businesses created or eliminated, and the number of jobs created or eliminated. The Department concluded the listing regulation would affect only the 17 known manufacturers of spray foam systems, two of which are known to be small businesses, and all of which are "likely to submit an [a]bridged [alternatives analysis r]eport."

The Department concluded listing spray foam systems as a priority product "is unlikely to result in the elimination or creation of [spray foam] systems manufacturing businesses." Given the usefulness of and demand for the product, the Department did "not anticipate that manufacturers will remove or replace unreacted MDI nor will they remove their [spray foam] products from the California marketplace." Further, because the Department's survey indicates there are "currently no known functionally equivalent or technically feasible alternatives to the use of unreacted MDI," the Department concluded businesses "could be created to assist manufacturers in meeting regulatory obligations by providing consulting services, as well as chemical and material science research and development support" while the manufacturers proceed through their regulatory obligations. Additional similar benefits to product safety specialists,

workplace trainers, and chemical researchers are also noted given the requirements imposed when an abridged alternatives analysis is undertaken.

With respect to jobs, the Department concluded the proposed regulatory requirements are "not likely to result in the creation or elimination of jobs in California," given that manufacturers are mostly out of state. However, "statewide job expansion could occur in areas related to business consulting, product research and design, manufacturing and sales of PPE, product marketing, consumer education, worker safety training, and professional certification programs."

The Economic Assessment also looks at the need for regulation and alternatives to the listing decision. On the need for regulation, the document states there are "no equivalent federal regulations that require product manufacturers to determine if the chemical in the product is necessary and if there is a safer alternative" and that California's "worker protection standards do not apply to consumers or sole proprietors." Accordingly, the "proposed regulation is an important supplement to current state and federal worker safety standards and the ongoing federal efforts to protect California workers by preventing worker and consumer injuries."

With respect to alternatives, the Economic Assessment considers three potential alternatives. The first two alternatives would increase the scope of the priority product by also including products "containing toluene diisocyanate" or "one-component pre-mixed cans" of spray foams containing MDI. These were rejected because the "TDI-containing coatings are a separate product that serves a different function" and pre-mixed spray foams do not have much unreacted MDI and exposures are not well characterized and assumed to be low. The third alternative allowed spray foam systems "manufacturers to take voluntary actions to minimize potential worker and consumer exposures to unredacted MDI." The Department rejected this option "because it does not advance the goals of the … regulations in general and of this proposed regulation in specific." The Department stated, "voluntary initiatives are not enforceable" and explained, "there

20.

would be no assurance that the [spray foam] industry would vigorously pursue safer alternatives to the use of unreacted MDI in [spray foam] products" and that the Department "needs to be able to take effective actions to ensure that workplaces are safe and that all [spray foam] applicators, including sole proprietors and consumers, have access to health and safety information." When discussing costs of this alternative, the Department noted it "did not quantify costs or benefits associated with [the third alternative] due to a lack of authority to implement this alternative."

*The Exemption Notice*

In an apparent effort to comply with its CEQA obligations, the Department issued the Exemption Notice with respect to its decision to list spray foam systems as a priority product. Summarizing the regulatory structure of the Green Chemistry law, the Department noted that after a priority product is identified, "a responsible entity may choose to remove the [chemical of concern] from the Priority Product; stop selling or distributing the Priority Product in California; or perform an Alternatives Analysis." The Department also explained that if the alternatives analysis route is chosen, the Department "may impose regulatory responses that are designed to prevent or significantly reduce the potential for adverse impacts to public health and the environment."

Looking at its decision to list spray foam systems as a priority product, the Department concluded the listing was exempt from CEQA because the "project will not result in a change in any of the physical conditions within the area affected by the project." Therefore, the Department found "with certainty that there is not a possibility that the activities in question will result in a significant environmental effect."

*The Administrative Challenge, Lawsuit, and Present Appeal*

After public hearings and consideration of the documents above, the Department eventually elected to add spray foam systems as a priority product. In March 2018, the

21.

Department submitted the final regulatory package for the listing regulation to the Office of Administrative Law. The listing was approved on April 26, 2018.

On May 30, 2018, ACC submitted an informal dispute resolution request to have the Department withdraw its listing of spray foam systems as a priority product. This request was denied on December 3, 2018. ACC then filed an appeal to the director, which was denied on February 25, 2019.

On August 9, 2019, appellants filed a petition for writ of mandate and complaint for declaratory and injunctive relief. An amended petition and complaint was filed on January 31, 2020, which became the basis for the underlying action. The amended petition and complaint contains one cause of action alleging a violation of statutory and regulatory authority, two causes of action under the APA, and one under CEQA. Ultimately, the trial court rejected the excess of authority and APA claims, but found a violation of CEQA. The present appeal and cross-appeal followed.

## DISCUSSION

In the context of the appeal and cross-appeal filed in this matter, we are asked to consider three distinct types of challenges to the Department listing spray foam systems as a priority product: (1) whether the Department's listing determination exceeded its legal authority; (2) whether the Department failed to satisfy the requirements of the APA; and (3) whether the Department failed to comply with CEQA. The first two challenges were rejected by the trial court and are appealed by appellants. The third was accepted by the trial court and is appealed by the Department. Each challenge contains several related subarguments. We consider these three primary challenges in the order presented in the briefing.

### *The Department Did Not Exceed Its Authority*

Appellants first contend the Department's decision to list spray foam systems as a priority product is unlawful and should be set aside. Appellants raise multiple bases for this contention. First, appellants argue that the decision to list spray foam systems as a

22.

priority product exceeded the Department's authority because the Department failed to identify any threshold level of exposure to the underlying chemical of concern. Next, appellants argue the Department exceeded its authority through its definition of spray foam systems, claiming the definition improperly groups multiple distinct products together, covers nonconsumer products, and includes products subject to existing regulations.

The Department responds by asserting it was not obligated to establish an exposure threshold under the law and that it did not act arbitrarily or capriciously when determining spray foam systems qualify as a priority product. The Department further disputes that it could not list high- and low-pressure spray foam systems together, that it could not deem such systems consumer products, and that any existing regulations prevented its priority product determination.

*Standard of Review*

When evaluating the validity of a regulation, there are two questions that can drive the court's analysis. The first asks "whether the regulation is ' "consistent and not in conflict with" ' the provision that authorizes it," and the second "whether the regulation is reasonably necessary to effectuate the purpose of the authorizing law." (*In re Gadlin* (2020) 10 Cal.5th 915, 926.) Particularly when the regulation constitutes a quasi-legislative rule, derived from lawmaking authority delegated to the agency, the scope of our review is narrow. (*Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 415 (*Western States*).) "When a regulation is challenged on the ground that it is not 'reasonably necessary to effectuate the purpose of the statute,' our inquiry is confined to whether the rule is arbitrary, capricious, or without rational basis [citation] and whether substantial evidence supports the agency's determination that the rule is reasonably necessary [citation]." (*Ibid*.) "[W]hen an implementing regulation is challenged on the ground that it is 'in conflict with the statute' [citation] or does not 'lay within the lawmaking authority delegated by the Legislature' [citation], the issue of

23.

statutory construction is a question of law on which a court exercises independent judgment." (*Ibid*.)

"We presume the validity of a regulation promulgated by a state agency. [Citation.] The burden lies with the party challenging the regulation to show its invalidity." (*In re Gadlin*, *supra*, 10 Cal.5th at p. 926.) " ' "Our function is to inquire into the legality of the regulations, not their wisdom." ' " (*Ibid*.) " ' "Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to[,] strike down such regulations." ' " (*Ibid*.)

*The Department Is Not Obligated To Set Threshold Exposure Levels*

Relying on the language of Health and Safety Code section 25252, subdivision (a)(2) and title 22, section 69503.2, subdivision (a)(1) and (2), appellants allege that the Department lacked authority to list spray foam systems as a priority product without expressly considering "any threshold level of what constitutes an exposure" to the underlying chemical of concern. According to appellants, one cannot demonstrate a " 'potential public … exposure' " or a " 'potential for one or more exposure to contribute to or cause significant widespread adverse impacts' " without first determining what level of exposure causes harm. Appellants argue that failing to identify this figure and using it when determining the potential risks expands the Department's authority beyond that authorized by the Green Chemistry law. Appellants further contend no evidence in the record shows that the exposure of workers or individual citizens using spray foam systems exceeds any level necessary to support a claim of potential public exposure or a potential for significant widespread adverse impacts, particularly when multiple settings for exposures are considered.

Appellants' argument is not persuasive. As noted above, Health and Safety Code section 25252, subdivision (a) authorizes regulations "to establish a process to identify and prioritize those chemicals or chemical ingredients in consumer products that may be

24.

considered as being a chemical of concern." The three identified statutory factors to consider in this process are: (1) the "volume of the chemical in commerce in this state"; (2) the "potential for exposure to the chemical in a consumer product"; and (3) the "[p]otential effects on sensitive subpopulations, including infants and children." (Health & Saf. Code, § 25252, subd. (a)(1)–(3).) From a plain language reading, then, the notion that a potential for exposure or a potential effect requires a set exposure level is unsustainable. While such a notion could be forcibly shoehorned into the concept of a potential for exposure, the same notion would be meaningless when identifying potential effects on sensitive subpopulations. (See *Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715–716 ["The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context. [Citations.] These canons generally preclude judicial construction that renders part of the statute 'meaningless or inoperative.' [Citation.] In addition, words should be given the same meaning throughout a code unless the Legislature has indicated otherwise."]; *Knapp v. Ginsberg* (2021) 67 Cal.App.5th 504, 533 [" 'We must construe identical words in different parts of the same act or in different statutes relating to the same subject matter as having the same meaning.' "].) Rather, the statutory use of "potential" makes sense only if it relates to the possibility of something happening, regardless of the extent.

The regulatory structure adopted for prioritizing products utilizes the term "potential" in the same manner as the statute. Paralleling the statutory language, the two "Key Prioritization Principles" set out in the regulations look at whether there is a "potential public … exposure to the Candidate Chemical(s) in the product" and whether there is the "potential for one or more exposures to contribute to or cause significant or widespread adverse impacts." (Tit. 22, § 69503.2, subd. (a)(1)–(2).) In other regulations, such as those focusing on identifying exposures, the regulations again track the general statutory guidance and utilize the term potential in ways that most naturally reads as relating to a possibility. For example, when considering the "occurrence, or potential

25.

occurrence, of exposures to" chemicals as an exposure factor. (Tit. 22, § 69503.3, subd. (b)(2).) This is further confirmed by the fact the regulations consider the "[f]requency, extent, level, and duration of potential exposure" for each use of the product as a separate factor. (Tit. 22, § 69503.3, subd. (b)(4)(F).) The language used separates the notion of extent or level of exposure from the possibility of potential exposure directly.

Upon review of the statutes and regulations, we see nothing in their language or structure that requires the Department "to identify any threshold level of what constitutes an exposure" in order to prioritize a product. Contrary to appellants' argument, this does not render the notion of "exposure" meaningless. As noted, the overall process is one of prioritization. Thus, minimal exposure levels or low possibilities for actual exposure in use are always relevant when comparing one product to another. But neither factor is necessary in order to determine a product qualifies for priority status under the multitude of factors considered.

Notably, appellants do not argue an abuse of discretion or excess of authority in ranking spray foam systems above some known chemical/product combination because the failure to consider a threshold exposure level made an objective difference in the prioritization process. Instead, appellants contend that without a set threshold for exposure level, the Department could not prioritize products at all. The multitude of factors considered by the Department, both based on the statute and implementing regulations, and the specific language used in both, demonstrates no such threshold exposure level is necessary for prioritization.

Further, even if some threshold exposure requirement was necessary, the record contains evidence supporting a conclusion that even miniscule exposure to MDI could cause meaningful harm to previously sensitized individuals. Although we agree with appellants that the record does not definitively show a substantial number of known injuries related to MDI exposure through the use of spray foam systems, we do not agree

26.

this demonstrates the Department's regulation was not reasonably necessary or otherwise flawed. Rather, as reflected above, the record is filled with evidence demonstrating the harmfulness of exposure to MDI. This evidence includes studies showing exposure causes severe asthma and the potential for death, the fact that MDI exposure may occur through multiple known routes attributed to use of spray foam systems, and the fact that even minimal exposure can be severely detrimental to sensitized populations. As the purpose of the statutory scheme is to identify chemicals contained in consumer products based in part on a potential for exposure and potential effects on sensitive subpopulations, this is substantial evidence showing the Department's determination MDI exposure through spray foam systems could be prioritized had a rational basis and was neither arbitrary nor capricious. (*Western States*, *supra*, 57 Cal.4th at p. 415 ["[w]hen a regulation is challenged on the ground that it is not 'reasonably necessary to effectuate the purpose of the statute,' our inquiry is confined to whether the rule is arbitrary, capricious, or without rational basis [citation] and whether substantial evidence supports the agency's determination that the rule is reasonably necessary"].)

*The Department Did Not Improperly Define Spray Foam Systems*

Appellants also argue the Department exceeded its authority in defining spray foam systems by (1) combining together distinct product categories of products, (2) failing to capture only "consumer products" in the definition of a spray foam system, and (3) including products already subject to regulation within the same definition.

Concerning the claim the Department improperly combined together distinct product categories when defining spray foam systems, appellants compare and contrast high-pressure and low-pressure spray foam systems, highlighting the fact that the Department was aware of these differences, before arguing that combining the two systems within one definition resulted in the Department expanding "the scope of its regulatory authority by ignoring critical differences in the products' potential exposure

and widespread and significant adverse impacts."[4] Appellants' arguments, however, fail to identify any statutory or legal basis for limiting the Department's authority to a single uniform product category. Rather, as noted above, the statutory scheme reads as much more focused upon the underlying chemicals of concern as opposed to the products in which they are contained. Upon review of the statutory language, we find nothing that would limit the Department's authority to include more than one product category within its prioritization process for a chemical of concern. Indeed, when the Department does impose regulations upon a chemical of concern, Health and Safety Code section 25257.1, subdivision (c) expressly states that the Department "shall not duplicate or adopt conflicting regulations for *product categories* already regulated … consistent with the purposes of this article." (Italics added.) This strongly supports the notion that the Department's statutory authority permits it to include multiple product categories within a single prioritization action if they share a chemical of concern.

The regulatory structure does not contradict this conclusion. The regulations focus on product-chemical combinations. To be prioritized, the regulations require a potential public exposure and the potential for one or more exposures to contribute to or cause significant or widespread adverse impacts. (Tit. 22, § 69503.2, subd. (a).) While many regulations focus on impacts and exposures in a product's life cycle, no regulation or definition prevents multiple product categories from being grouped into a single product definition. Even the regulatory definition for a priority product seeks only to define a

---

**4** Appellants focus on whether the Department exceeded its authority by combining two different product types into one definition. Appellants do not raise any issues concerning whether the Department could prioritize products instead of chemicals under the statutory authorization for further regulations. (See Health & Saf. Code, §§ 25252, subd. (a)(1) [authorizing regulations "to establish a process to identify and prioritize those chemicals or chemical ingredients in consumer products that may be considered as being a chemical of concern" including factors such as "the volume of the chemical" in the state], 25253, subd. (a)(1) [authorizing regulations "that establish a process for evaluating chemicals of concern in consumer products"].) Our opinion here takes no position on that potential argument.

28.

product-chemical combination specific enough "for a responsible entity to determine whether *one or more of its products*" meets the definition. (Tit. 22, § 69503.5, subd. (b)(1)(A), italics added.) Likewise, if the product-chemical combination is a component used within multiple products, the Department is required to identify those products if known. (Tit. 22, § 69503.5, subd. (b)(1)(B).) Nothing in the regulatory scheme would prevent the Department from broadly defining a product-chemical combination provided it then prioritized that combination based on the known facts for products contained within that definition according to the regulatory factors.

Upon review, then, the court finds the Department did not exceed its statutory or regulatory authority when it defined spray foam systems to include both high-pressure and low-pressure systems. The underlying chemical of concern is the same in both systems, and the systems share at least one similarity in that the definition requires the combination of two canisters of products, one containing the chemical of concern. Further, as noted above, the record contains at least some evidence regarding exposure for both systems and indicates that even minimal exposure can be problematic for previously sensitized groups. The Department thus had a properly developed definition and adequate evidence to engage in its prioritization process for the definition chosen.

Appellants next contend the definition of spray foam systems is improper because it includes products that are not "consumer products" as required by the statutory and regulatory scheme. More specifically, appellants point out that high-pressure foam systems are used exclusively by professional workers in commercial settings who are specifically trained in their use. Appellants' position, however, runs contrary to one of the few statutory definitions provided by the Legislature. The statutory definition of consumer product covers "a product or part of the product that is used, brought, or leased for use by a person for any purposes" and specifically excludes at least one product that would be used by professionals and not consumers in the colloquial sense, dental restorative materials. (Health & Saf. Code, § 25251, subd. (e).) A plain reading of the

29.

definition shows the Department did not exceed its authority in selecting a definition that included high-pressure spray foam systems. Regardless of their use in commercial settings, such products are used by persons for a purpose and, unlike dental restorative materials, are not excluded from the definition of consumer products selected by the Legislature. Moreover, the Legislature's specific choice of broad language and the lack of any conflict between the definition and the regulatory scheme enacted differentiates this case from those cited by appellants, such as *Styrene Information & Research Center v. Office of Environmental Health Hazard Assessment* (2012) 210 Cal.App.4th 1082, 1096–1098, where a literal reading of the statute would be inconsistent with voter intent, and *Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 757, where the contested products could not be used in a manner that fit within the construct of the overall statutory scheme. There is nothing in the statutory definition, statutory scheme, or regulatory scheme that would warrant deviating from the literal language utilized by the Legislature.

Appellants' third argument is that the Department exceeded its authority by adopting a definition that included products already regulated by existing workplace regulations. Again, the focus is upon high-pressure spray foam systems, which are already regulated by the federal government's Occupational Safety and Health Administration and California's parallel agency. Here, appellants claim that the Department's justification for listing spray foam systems as a priority product, thus triggering regulatory response requirements, is insufficient and therefore the listing exceeds the Department's authority as defined by title 22, sections 69501, subdivision (b)(3)(A) and 69503.2, subdivision (b)(2).

Title 22, section 69501, subdivision (b)(3)(A)(1)–(2) states the overall regulations do not apply to already regulated consumer products provided those existing regulations "[a]ddress the same potential adverse impacts, [and] potential exposure pathways … that could otherwise be the basis for the product being listed as a Priority Product" and "[p]rovide a level of public health and environmental protection that is equivalent to or

30.

greater than the protection that would potentially be provided if the product were listed as a Priority Product." Title 22, section 69503.2, subdivision (b)(2) requires the Department to consider other regulations in existence to determine "the extent to which these other regulatory requirements address, and provide adequate protections with respect to the same potential adverse impacts and potential exposure pathways … that are under consideration as a basis for the product-chemical combination being listed as a Priority Product." We review an agency's action in this context to " 'determine whether the agency's action was arbitrary, capricious, or without evidentiary support, and/or whether it failed to conform to the law.' " (*California Assn. of Medical Products Suppliers v. Maxwell-Jolly* (2011) 199 Cal.App.4th 286, 302–303 (*Maxwell-Jolly*).)

The record shows the Department recognized the existence of workplace regulations relating to MDI exposure. For example, it explained that both federal and state authorities had "established Permissible Exposure Limits for MDI that employers must observe," which were "typically achieved through training and the use of PPE." However, the Department determined these regulatory efforts were "the least desirable because the original hazard … is still present in the workplace" and did "not apply to consumers or sole proprietors." The Department stated its listing of spray foam systems would work as "an important supplement" to the current standards, which it had concluded were not equivalent to the regulatory scheme enacted through the Green Chemistry law. Further, in response to a comment about duplicating existing laws, the Department stated it "disagrees that current laws applicable to [spray foam systems] provide adequate protection," and pointing to its discussion of "Exposure and PPE," stated, "Eliminating the chemical hazard entirely, or substituting a less hazardous chemical, is the most effective means of minimizing potential occupational chemical exposures."

As appellants point out, preexisting regulations set exposure limits for MDI at ranges around and including 20 parts per billion. Yet, in its technical discussions, the

31.

Department pointed to evidence that sensitive subpopulations can be harmed by very low exposures, including those below the various exposure limits set by state and federal regulations. Further, the Department noted that exposures are not limited to inhalation protected by current regulations, but includes dermal routes, particularly in previously sensitized populations. This evidence supports the Department's conclusion that current regulations fail to provide adequate protection for individuals exposed to MDI. Even if we assume existing regulations perfectly prevent workplace injuries due to overexposure through inhalation, a point also contested by the evidence cited by the Department, the regulations are not designed to protect against known exposure risks to sensitive subpopulations or exposures through dermal contacts. The difference in exposure pathways, known risks, and existing protection shows the Department's position does not render title 22, "section 69501[, subdivision ](b)(3)(A) meaningless surplusage," as argued by appellants. Rather, these differences highlight the Department's determination that the chemical of concern in this case is not adequately regulated to cover the known exposure pathways and risks it presents in the community. Listing spray foam systems as a priority product, then, does not run afoul of the regulations prohibiting the Department from superseding existing regulatory authority because the existing regulations do not provide an equivalent protection to public health.[5]

### *The Department Satisfied the APA*

Appellants raise three arguments why the Department's efforts to comply with the APA were inadequate. With respect to the requirement that the Department conduct an economic analysis, appellants argue the Department engaged in a mismatched analysis

---

[5]     We take no position, however, on whether future regulatory action taken against spray foam systems subject to current workplace regulations as contemplated by Health and Safety Code section 25253, subdivision (b) would be valid under Health and Safety Code section 25257.1, subdivision (c)'s restriction on adopting conflicting regulations for product categories already regulated should they result in additional burdens on the use of such products in workplace settings.

when considering the costs and benefits of the proposed regulation.  With respect to the requirement that the Department conduct an alternatives analysis to the regulatory listing, appellants argue both that the Department failed to identify and fully assess reasonable alternatives and that the Department misunderstood its authority to impose an enforceable consent agreement.

*Standard of Review and Applicable Law*

"[T]he APA establishes basic minimal procedural requirements for rulemaking in California.  [Citation.]  'Pursuant to those procedural requirements, agencies must, among other things, (1) give the public notice of the proposed regulatory action; (2) issue a complete text of the proposed regulation with a statement of reasons for it; (3) give interested parties an opportunity to comment on the proposed regulation; (4) respond in writing to public comments; and (5) maintain a file as the record for the rulemaking proceeding.' " (*John R. Lawson Rock & Oil, Inc. v. State Air Resources Bd.* (2018) 20 Cal.App.5th 77, 111.)

With respect to the obligation to provide a statement of reasons for the regulation, an agency is required to conduct both an economic impact assessment and a reasonable alternatives analysis.  The economic impact assessment must be submitted with the initial statement of reasons as part of the required notice of proposed action.  (Gov. Code, § 11346.2, subd. (b).)  The reasonable alternatives analysis must be submitted with the final statement of reasons.  (Gov. Code, § 11346.9, subd. (a)(4).)

Looking first at the economic impact assessment, a "state agency proposing to adopt, amend, or repeal any administrative regulation shall assess the potential for adverse economic impact on California business enterprises and individuals, avoiding the imposition of unnecessary or unreasonable regulations or reporting, recordkeeping, or compliance requirements." (Gov. Code, § 11346.3, subd. (a).)  In addition, for regulations such as the one contested here, the agency must assess "whether and to what extent [the regulation] will affect the following":  (1) "[t]he creation or elimination of

33.

jobs within the state"; (2) "[t]he creation of new businesses or the elimination of existing businesses within the state"; (3) "[t]he expansion of businesses currently doing business within the state"; and (4) "[t]he benefits of the regulation to the health and welfare of California residents, worker safety, and the state's environment." (Gov. Code, § 11346.3, subd. (b)(1)(A)–(D).) The analysis is "intended to provide agencies and the public with tools to determine whether the regulatory proposal is an efficient and effective means of implementing the policy decisions enacted in statute or by other provisions of law in the least burdensome manner." (Gov. Code, § 11346.3, subd. (e).)

The economic impact assessment can essentially result in one of two findings— the action may have a significant impact, or the action will not have a significant impact. If the agency "makes an initial determination that the action may have a significant, statewide adverse economic impact directly affecting business," it must include information regarding the types of businesses affected, a description of compliance requirements resulting from the action, and a statement seeking submission of alternatives "in the notice of proposed action." (Gov. Code, § 11346.5, subd. (a)(7).) If the agency "makes an initial determination that the action will not have a significant, statewide adverse economic impact directly affecting business, including the ability of California businesses to compete with businesses in other states, it shall make a declaration to that effect in the notice of proposed action. In making this declaration, the agency shall provide in the record facts, evidence, documents, testimony, or other evidence upon which the agency relies to support its initial determination." (Gov. Code, § 11346.5, subd. (a)(8).) Regardless of which finding is made, the statute requires a "description of all cost impacts, known to the agency at the time the notice of proposed action is submitted to the office, that a representative private person or business would necessarily incur in reasonable compliance with the proposed action." (Gov. Code, § 11346.5, subd. (a)(9).) Notably, though, these requirements "shall not be construed in any manner that results in the invalidation of a regulation because of the alleged

34.

inadequacy of the notice content or the summary or cost estimates, or the alleged inadequacy or inaccuracy of the housing cost estimates, if there has been substantial compliance with those requirements." (Gov. Code, § 11346.5, subd. (c).)

The Legislature has explained that the economic impact assessment is not meant to "impose additional criteria on agencies, above that which exists in current law, in assessing adverse economic impact on California business enterprises, *but only to assure that the assessment is made early in the process*." (*Maxwell-Jolly*, *supra*, 199 Cal.App.4th at p. 307.) "The qualifying adjective 'initial' indicates the agency's determination need not be conclusive, and the qualifying adjective 'significant' indicates that the agency need not assess or declare *all* adverse economic impact[s] anticipated." (*Ibid*.) Notably, "a regulation is not necessarily invalid, even if it has a significant adverse economic impact on business" as "regulations *may* have negative economic impacts if necessary or reasonable under the circumstances." (*Id*. at p. 306.)

Turning to the reasonable alternatives analysis, after all relevant periods of public comment, the agency seeking to create a new regulation must submit a final statement of reasons that includes the reasonable alternatives analysis contested in this case. The agency must submit a "determination with supporting information that no alternative considered by the agency would be more effective in carrying out the purpose for which the regulation is proposed, would be as effective and less burdensome to affected private persons than the adopted regulation, or would be more cost effective to affected private persons and equally effective in implementing the statutory policy or other provision of law." (Gov. Code, § 11346.9, subd. (a)(4).) Relatedly, the agency must submit an "explanation setting forth the reasons for rejecting any proposed alternatives that would lessen the adverse economic impact on small businesses." (Gov. Code, § 11346.9, subd. (a)(5).)

A regulation may be overturned based on a failure to properly complete either of these requirements. However, the bases for overturning a regulation are limited. Under

the statutory scheme, a "regulation or order of repeal may be declared to be invalid for a substantial failure to comply" with the APA. (Gov. Code, § 11350, subd. (a); see *Maxwell-Jolly*, *supra*, 199 Cal.App.4th at p. 303 ["The regulation 'may' be declared to be invalid by a court because of a ' "substantial failure" to comply with' the APA."].) "In addition to any other ground that may exist, a regulation or order of repeal may be declared invalid if either" the agency's determination that a regulation is reasonably necessary to support the purpose of a statute "is not supported by substantial evidence" or the "agency declaration pursuant to paragraph (8) of subdivision (a) of [Government Code s]ection 11346.5 is in conflict with substantial evidence in the record." (Gov. Code, § 11350, subd. (b)(1)–(2); see *Maxwell-Jolly*, at p. 304 [summarizing same].)

The language referencing a substantial failure to comply is understood as requiring "substantial compliance" with the substance essential to the reasonable objectives of the statutory scheme. (See *Maxwell-Jolly*, *supra*, 199 Cal.App.4th at p. 307.) " ' " 'Where there is compliance as to all matters of substance[,] technical deviations are not to be given the stature of noncompliance.… Substance prevails over form.' " ' " (*Ibid*.; see *Sims v. Department of Corrections & Rehabilitation* (2013) 216 Cal.App.4th 1059, 1073 ["noncompliance is insubstantial, or 'harmless,' only where it does not compromise any 'reasonable objective' of the APA"].)

" ' "Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citation.] "Substantial evidence … is not synonymous with 'any' evidence." Instead it is " ' "substantial" proof of the essentials which the law requires' " [Citations.] The focus is on the quality, rather than the quantity, of the evidence.' " (*Maxwell-Jolly*, *supra*, 199 Cal.App.4th at p. 308.)

Appellants' APA arguments were raised under two claims brought for declaratory relief under Code of Civil Procedure section 1060 and Government Code section 11350. The standards for resolving the validity of regulations subject to the APA, however, are regularly considered under the principles applicable to a writ of mandate. (See *Maxwell-*

*Jolly*, *supra*, 199 Cal.App.4th at pp. 302–303 ["a trial court's role generally is to 'determine whether the agency's action was arbitrary, capricious, or without evidentiary support, and/or whether it failed to conform to the law' "]; *Western States*, *supra*, 57 Cal.4th at p. 429 [adopting *Maxwell-Jolly*'s analysis after summary judgment granted on regulatory validity].)  Under this framework, this court " ' " 'may make its own determination when the case involves resolution of questions of law where the facts are undisputed' " ' " and utilizes the same standard as the trial court when reviewing for substantial evidence.  (*Maxwell-Jolly*, at p. 303.)  The trial court cited to these same standards in its order but did not indicate whether it was treating the claim as one for summary judgment on a declaratory relief claim or resolution of the same issues through writ of mandate.  Regardless, neither party in this case disputes the standard of review on these issues nor raises procedural issues with the trial court's order, and both argue in the context of the *Maxwell-Jolly* analysis.  We, too, apply that standard.

*The Economic Impact Assessment Was Adequate*

Appellants argue that the Department's economic impact assessment was inadequate because of a mismatch between the identified benefits of the listing decision and the identified costs of that same decision.  More specifically, appellants claim that the Department identified benefits from the listing decision that would only arise after additional regulatory actions were taken—such as expanded business interests arising from researching alternative chemical options and future health benefits from reducing future exposures—while failing to account for any costs arising in the same timeframe—such as research, development, and consulting fees and allegedly increased consumer costs from reduced heating efficiency.  This mismatch allegedly resulted in an incomplete costs analysis and an economic determination that conflicts with substantial evidence in the record.

The Department contests this argument in four ways.  First, the Department generally asserts that its analysis complied in all respects with the APA's requirements,

particularly focusing on the fact the regulatory action analyzed was that of listing foam spray systems as priority products. Second, the Department notes that even if it did note some irrelevant costs, the APA only requires it to consider significant known impacts, which the Department claims it did. Third, the Department states that while its analysis was complete and correct in terms of the factors it considered, it was unable to and therefore did not quantify the contested benefits, meaning any alleged imbalance did not occur. Fourth, the Department notes that its finding that there may be a significant financial impact means both that its analysis is not subject to the same statutory and legal scrutiny argued by appellants and that its conclusion was properly supported by the record.

We note at the outset that this court's review of a finding regarding the potential for a significant economic impact asks whether the Department made "an initial showing that there was some factual basis for [its] decision" that substantially complied with the statutory scheme and is supported by substantial evidence in the record. (*Western States*, *supra*, 57 Cal.4th at p. 429.)

Under this standard, even if we assume the Department utilized an unbalanced comparison of costs and benefits, appellants' argument that the Department's determination warrants invalidating the regulation listing spray foam systems as a priority product still fails. This is so because the Department's process substantially complied with the requirements of the APA and because appellants' arguments for error fail to show how the alleged error would impact the Department's finding.

As noted above, the APA requires the Department to engage in a multi-step process to determine whether the proposed regulation may or will not have a significant economic impact. As part of this process, the Department is tasked with making an initial determination, releasing that determination publicly for comment, and then updating the initial determination to reflect either changes based on or rejections of the comments received. (*Western States*, *supra*, 57 Cal.4th at pp. 425–426.) The initial

determination need not be conclusive or all encompassing. But it must be more than mere speculative belief and must include a description of all cost impacts to a representative person or business that are known at the time and would be necessarily incurred. (*Id*. at pp. 427–428.)

Here, the Department followed this procedure. It gathered information on expected costs through surveys and other fact gathering and publicly disclosed its determination that the proposed regulation may have a significant economic impact in the form of costs associated with the regulatory response deemed most likely to occur based on the surveys. In response, the Department received public feedback, including from appellants, that suggested it had not properly considered all of the future costs associated with the regulatory decision. The Department responded to those comments, asserting that it had only included costs associated with the immediate regulatory response expected, based on industry feedback.

As to procedure and statutory expectations, the process used by the Department in this case substantially complied with the requirements of the APA. In determining there may be a significant economic impact from the regulation proposed, the Department was required to describe, among other factors, any "compliance requirements" resulting from the action and "all cost impacts, known to the agency at the time the notice of proposed action is submitted to the office, that a representative private person or business would necessarily incur in reasonable compliance with the proposed action." (Gov. Code, § 11346.5, subd. (a)(7)(B), (9).) These figures assist with the future determination whether any reasonable alternative exists to the proposed regulation. The Department was able to quantify the expected costs associated with the expected response under the regulation and was able to, and did, provide substantial evidence regarding the basis for these determinations. As such, parties reviewing the record would understand the perceived costs and have sufficient guidance to suggest potential alternatives if such

alternatives existed. We conclude, in the context of a finding there may be a substantial economic impact, that the Department's actions substantially complied with the APA.

Appellants relatedly argue, under the premise the Department failed to consider all relevant costs, that the Department utilized a mismatched economic impact assessment through consideration of long-term benefits of the underlying law but only immediate costs. Even assuming the Department had an obligation to consider costs associated with potential future regulatory responses, as argued by appellants, the failure to do so in this particular case would not demonstrate a failure to substantially comply with the requirements of the APA or a lack of substantial evidence supporting the Department's determination.[6]

As noted, the purpose of the APA is to provide an early indication of the costs and effects of a proposed regulation in order to determine whether the proposal will adversely affect business and thus to provide an opportunity to properly consider less economically impactful but equally effective alternatives. As the Department's finding that there may be a significant economic impact from the regulation was supported by substantial evidence, appellants' argument that additional evidence of increased costs must be considered before the regulation can be upheld is misplaced. The purpose of the statute was met the moment substantial evidence supported the Department's determination that there may be a significant impact. Unlike cases where the Department contends no impact will occur, the actions required to satisfy the APA do not meaningfully change once the evidence reaches a critical mass and triggers the conclusion there may be a significant financial impact. Rather, at that point, the focus turns to the alternatives available and whether there is a reasoned basis to reject any reasonable alternatives

---

[6] As best as this court can discern, the statutory underpinning of appellants' argument is the requirement the Department consider all cost impacts to a representative person or business that are known at the time and would be necessarily incurred. It is not evident, however, how costs associated with one of multiple potential future regulatory actions could be known at the time and necessarily incurred.

identified. Appellants' claim there was no substantial compliance with the APA because the Department did not identify enough of a substantial economic impact thus fails. We therefore turn to whether the alternatives analysis conducted by the Department was proper given the supportable finding there may be a significant economic impact from the decision to list spray foam systems as a priority product.

*The Reasonable Alternatives Analysis Was Adequate*

With respect to the alternatives analysis conducted by the Department, appellants argue the Department "failed properly and fully to consider an [enforceable consent agreement] as an adequate alternative to the listing decision." Appellants contend the Department failed to consider the alternative of a consent agreement or permit public comment on the idea because it incorrectly determined it lacked the authority to enter into such an agreement as an alternative to the listing decision. The Department responds with the position that it acted appropriately because it determined the proposed alternative was not reasonable, therefore relieving the Department from considering it under the statutory scheme, and further that it lacked authority to impose a consent agreement in lieu of a regulatory listing

Government Code section 11346.2, subdivision (a)(4)(A) requires a "description of reasonable alternatives to the regulation and the agency's reasons for rejecting those alternatives" as part of the initial statement of reasons. The argument raised by appellants in this case, however, focuses on whether the Department satisfied section 11346.9, which does not specifically mention "reasonable alternatives." Despite this lack of symmetry in language, both parties' arguments proceed on the assumption that alternatives must be reasonable to be considered. Accordingly, we accept the premise that only reasonable alternatives must be considered for the purposes of the issues raised.

Accepting this premise, we agree with the Department's argument that an enforceable consent decree is not a reasonable alternative and find that its rejection of

41.

that option is supported by substantial evidence. Under Government Code section 11346.2, subdivision (b)(4)(A), "[r]easonable alternatives … include, but are not limited to, alternatives that are proposed as less burdensome and equally effective in achieving the purposes of the regulation in a manner that ensures full compliance with the authorizing statute or other law being implemented or made specific by the proposed regulation." In this case, the Department rejected the idea of utilizing voluntary industry programs in place of listing spray foam systems as a priority product both prior to and throughout the regulatory proceedings.

The Department's reasoning remains consistent throughout and is reflected in the administrative record. As early as 2015, in response to pre-listing options raised by appellants through ACC, the Department explained it did not believe voluntary programs, including attempts at enforceable agreements, are appropriate alternatives to identifying a product as a priority product. The Department explained the strategies covered by the proposed agreements were already at least partially available nationally, would not ensure equal coverage of all potential manufacturers, and might not be enforceable under the law. Particularly with respect to coverage, the Department noted the proposed framework creates problems for the Department and "also leaves product manufacturers who have signed onto the alternative process proposed here at a disadvantage to those who have not signed on." In contrast, regulatory coverage would ensure "any new product manufacturer would still be a responsible entity and would need to comply with the regulatory requirements" to sell products in California.

In 2017 ACC comments, appellants noted that the Department "described three possible alternatives to the current proposal, including the industry's proposed alternative to the regulation" but argued they disagreed with the Department's conclusion that voluntary programs would not achieve the purpose of the Green Chemistry law. In its final statement of reasons, the Department again rejected the industry's proposal of voluntary action, explaining "it does not advance the goals of the [Safer Consumer

42.

Product] regulations in general and of this proposed regulation in specific: to drive [spray foam] systems manufacturers to find safer alternatives to MDI in [spray foam systems] while avoiding regrettable substitutions. Additionally, voluntary initiatives are not enforceable."

The Department's concerns track the language of the underlying statutory scheme and the practical realities of the regulatory system in place. Health and Safety Code section 25252 requires that the Department "identify and prioritize those chemicals or chemical ingredients in consumer products that may be considered as being a chemical of concern" (Health & Saf. Code, § 25252, subd. (a)) and "develop criteria by which chemicals and their alternatives may be evaluated" (Health & Saf. Code, § 25252, subd. (b)(1)). Similarly, Health and Safety Code section 25253 requires that the Department "establish a process for evaluating chemicals of concern in consumer products, and their potential alternatives, to determine how best to limit exposure or to reduce the level of hazard posed by a chemical of concern" (Health & Saf. Code, § 25253, subd. (a)(1)) and "establish a process that includes an evaluation of the availability of potential alternatives" (Health & Saf. Code, § 25253, subd. (a)(2)). Only once this review is complete does the Department determine what regulatory responses are required, if any. (Health & Saf. Code, § 25253, subd. (b).) As discussed more fully above, the regulatory structure adopted identifies chemicals with known toxicities and then seeks to identify a limited number of high priority products utilizing one or more of those chemicals so that the state may leverage manufacturers of those products when conducting alternatives analyses and deciding on appropriate regulatory actions.

Accordingly, in light of the requirements of the authorizing statutes and regulatory scheme in place, the suggestion that enforceable consent agreements be used in place of listing spray foam systems as a priority product was not a reasonable alternative. Failing to list spray foam systems as a priority product would result in the Department not conducting the alternatives analysis for the underlying chemicals required under the

statutes, undermine the prioritization process for chemicals utilized in consumer products required by the statutes, and curtail the Department's ability to impose any appropriate regulatory responses under the regulatory scheme adopted to implement the relevant statutes. Further, only those that enter into agreements could be governed by their terms, leaving new market entrants and holdouts to different standards than signatories. In this way, the Department's identified concerns show the use of enforceable consent agreements would not be equally effective in achieving the purpose of the statute and would not fully comply with the authorizing statutes. The record evidence shows the Department reviewed the proposed alternative and determined it was not reasonable. We agree with this conclusion. As an unreasonable alternative, the proposal did not trigger any statutory obligation under the APA to have the Department identify and discuss enforceable consent agreements as a reasonable alternative to the listing decision.[7]

### *Appellants' CEQA Claim Is Untimely*

As noted at the outset, this case consists of a cross-appeal filed by the Department over appellants' CEQA claim. The Department argues both that this claim was time-barred and that the trial court erred in concluding the Department violated CEQA when it determined that its priority product listing determination was exempt from CEQA. Ultimately, we agree with the Department that appellants failed to timely file their CEQA claim. As such, we do not reach whether appellants' claim of a CEQA violation was correct.

---

**7** Having reached this determination, the court need not reach whether the Department correctly considered whether it has authority to enter into such agreements in the first place. The court notes, however, that the allegedly authorizing statute, Health and Safety Code section 25180, subdivision (d), refers to "enforcing" laws contained within the relevant chapter and specifically points to examples such as imposing penalties, referring violations for prosecution, settling cases, and adopting enforcement policies. The court does not readily see how identifying priority products under the current regulations falls within the Department's enforcement authority and, thus, how the Department could enter into an enforceable agreement with manufacturers in lieu of the listing decision.

44.

*Additional Relevant Facts*

As noted in the court's initial factual recitation, the Department drafted and published the Exemption Notice from CEQA when reaching its decision to list spray foam systems as a priority product.[8]  At the outset of the regulatory process, the Department explained in its initial notice of proposed regulatory action that it had "determined that this rulemaking project is exempt under CEQA (Pub[.] Resources Code[, §] 21000[] et seq.).  This rulemaking meets the General Rule Exemption available under Section 15061[, subdivision] (b)(3) of Title 14 of the California Code of Regulations.  A draft Notice of Exemption [] is available for review with this rulemaking file and will be filed with the State Clearinghouse when the regulations are adopted."  The Department then received public comments alleging it was not properly complying with CEQA as part of its overall regulatory process.  The Department made no changes to its CEQA position based on the comments and ultimately rejected them when issuing its final statement of reasons in February 2018.

Shortly thereafter, the Department sent its proposed regulatory package to the Office of Administrative Law.  On April 26, 2018, the Office of Administrative Law endorsed, approved, and filed the regulatory package.  And on May 1, 2018, the Department issued an alert stating that spray foam systems would be listed as a priority product effective July 1, 2018.

On May 30, 2018, ACC started the informal appeal process designated in title 22, section 69507.1.  ACC proceeded through the full regulatory dispute resolution process until their concerns were finally rejected on February 25, 2019.  Appellants then filed a petition for writ of mandate on August 9, 2019.

---

[8]    Although the Exemption Notice was drafted and published, there is no dispute that it was not forwarded to the Office of Planning and Research or any other government agency relevant to the CEQA analysis.  As such, the publication did not potentially trigger a shorter statute of limitations than the 180-day period discussed below.

The Department filed a demurrer. In its filing, the Department argued that appellants' CEQA claim was time-barred because it had not been filed within 180 days of the Office of Administrative Law's endorsement, approval, and filing of the regulatory package. Relevant to a dispute raised in this appeal, the Department also sought to dismiss all claims raised by General Coatings, including by implication the CEQA claim, on the ground there was no proof that General Coatings exhausted its administrative remedies. The trial court overruled the demurrer with respect to the timeliness claim, finding the Department's decision was not final until completion of the regulatory appeals and therefore that the statute of limitations did not begin to run until that time. The court sustained the demurrer with respect to General Coatings, however, concluding there was no evidence it had exhausted its administrative remedies. The court's analysis relied on a conclusion that completing the Safer Consumer Products regulations' dispute resolution procedures was required before filing suit. The Department again raised the issue of timeliness as a part of its briefing in opposition to the writ of mandate. In that position, the Department argued the trial court had incorrectly concluded the Green Chemistry law's regulatory proceedings applied to CEQA issues. The trial court again rejected the timeliness argument, reiterating its finding that the statute of limitations had been tolled before noting that the issue had previously been resolved and refusing to reconsider that ruling.

*Standard of Review and Applicable Law*

In circumstances similar to this case, where the relevant agency has determined its project is exempt from CEQA, a party has 180 days from the approval of the project to file suit if the public has not been given the required notice that the project is exempt from CEQA. (See Pub. Resources Code, § 21167, subd. (d) ["If the notice has not been filed, the action or proceeding shall be commenced within 180 days from the date of the public agency's decision to carry out or approve the project."].) Although the language of the relevant statute can be confusing, both the CEQA Guidelines and the case law

46.

consistently interpret it to set a 180-day statute of limitations regardless of the basis for the exemption finding. (See CEQA Guidelines, § 15112, subd. (c)(5)(A) ["The statute of limitations periods under CEQA are as follows: [¶] … [¶] (5) Where; none of the other statute of limitations periods in this section apply, 180 days after … [¶] (A) The public agency's decision to carry out or approve the project."]; *City of Chula Vista v. County of San Diego* (1994) 23 Cal.App.4th 1713, 1719–1720 ["If an agency determines a project is categorically exempt from the environmental review requirements of CEQA and proceeds to approve the project, any party objecting that such determination was improper must file an action within 35 days after a valid [notice of exemption] has been filed by the agency. If none was filed or the [notice of exemption] is defective in some material manner, the filing period for actions is limited to 180 days after the project is approved."]; *Save Lafayette Trees v. East Bay Regional Park Dist.* (2021) 66 Cal.App.5th 21, 40 ["Our Supreme Court has held that when an agency approves a project without filing either a notice of determination [] as to whether a project will have a significant environment impact or a[ notice of exemption] as to whether a project is statutorily exempt from CEQA, [Pub. Resources Code, §] 21167 nonetheless 'permits a legal challenge to be brought up to 180 days after the agency's decision or commencement of the project,' which 'is deemed *constructive notice* for potential CEQA claims.' "].)

Where the underlying facts are not disputed, we review a finding regarding the applicability of CEQA's statute of limitations de novo. (*Cumming v. City of San Bernardino Redevelopment Agency* (2002) 101 Cal.App.4th 1229, 1232–1233.)

*Appellants' CEQA Claim Was Not Timely*

Neither party in this case contests that a 180-day statute of limitations applies. Rather, the core dispute is when that period began to run. Underlying that determination is a dispute over whether the Safer Consumer Products' regulatory structure for administrative appeals covers CEQA issues.

The general principle that one must exhaust administrative remedies is applicable in CEQA cases. Indeed, CEQA itself has a core exhaustion requirement which precludes actions unless one has raised the CEQA issue during a required public comment period. (Pub. Resources Code, § 21177, subd. (a) ["An action or proceeding shall not be brought pursuant to [Pub. Resources Code, §] 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person during the public comment period provided by this division or before the close of the public hearing on the project before the issuance of the notice of determination."]; see *Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 291 ["the exhaustion-of-administrative-remedies requirement set forth in subdivision (a) of [Pub. Resources Code §] 21177 applies to a public agency's decision that a proposed project is categorically exempt from CEQA compliance as long as the public agency gives notice of the ground for its exemption determination, and that determination is preceded by public hearings at which members of the public had the opportunity to raise any concerns or objections to the proposed project"].) CEQA does not, however, require an administrative appeal as part of its administrative exhaustion requirements. (*McCann v. City of San Diego* (2021) 70 Cal.App.5th 51, 76 [Pub. Resources Code, "[§] 21177 addresses the exhaustion of administrative remedies in CEQA cases, but it does not prescribe a specific appeal process following a determination a project is exempt from CEQA"].) Rather, several "cases recognize that when an agency elects to adopt an administrative appeal process, the common law rule requiring the exhaustion of administrative remedies applies to CEQA litigation and the scope of the remedy is 'determined by the procedures applicable to the public agency in question.' " (*McCann*, at p. 77.)

In these cases, however, the administrative procedures adopted specifically include review of CEQA determinations. (See *Tahoe Vista Concerned Citizens v. County of Placer* (2000) 81 Cal.App.4th 577, 582, 592 [exhaustion requirement not met where

48.

the appellant failed to check box for raising CEQA dispute in administrative appeal]; *California Clean Energy Committee v. City of San Jose* (2013) 220 Cal.App.4th 1325, 1345 [administrative appeal process specifically references environmental impact report]; but see *San Bernardino Valley Audubon Society, Inc. v. County of San Bernardino* (1984) 155 Cal.App.3d 738, 747–748 [questioning whether right to appeal "land use decision" would cover CEQA requirement before rejecting lack of exhaustion argument on different grounds].) Moreover, even where an appeal was possible but not taken, exhaustion was excused where the final decisionmaker was informed of the dispute and held public hearings on issues raised. (See *California Clean Energy Committee*, at pp. 1347–1348 [administrative exhaustion satisfied despite lack of appeal from initial decision where final decisionmaking body presented arguments, held public hearings, and directly responded to issues when adopting environmental impact report].) In context, then, the case law shows full exhaustion of an agency's administrative appeals process is only required in a CEQA case when the agency has crafted administrative proceedings that include CEQA issues within their scope. If no such decision has been made, CEQA's core exhaustion requirements control and there is no obligation to administratively appeal an adverse determination. For this reason, the deadline for filing a CEQA action in this case turns on whether the administrative remedies covered by the Green Chemistry law regulations include review of CEQA issues or whether the standard CEQA exhaustion requirements are all that are needed to exhaust administrative remedies.

Turning to the administrative dispute resolution process for the Safer Consumer Products regulations, this court sees no indication that CEQA issues are included within its provisions. The overall process is set out at title 22, sections 69507 through 69507.6. From the outset its scope is limited. The initial applicability statement limits the process to only resolving disputes by responsible entities over decisions made by the Department under the Safer Consumer Products regulations. (Tit. 22, § 69507, subd. (a) ["[t]his

article applies to any responsible entity that wishes to dispute a decision made by the Department under this chapter that applies to the responsible entity"].)  The statement on exhaustion limits itself to "resolving disputes arising under this chapter," and the statement of scope further limits the range of issues by excluding from review decisions "made by the Department under article 2, 4, or 9" of chapter 55.[9]  (Tit. 22, § 69507, subds. (b), (c).)  Even the automatic stay is limited; not to any regulatory process but rather to requirements "imposed by the Department under this chapter on a responsible entity, and any posting concerning the requirement on the Failure to Comply List." (Tit. 22, § 69507, subd. (d).)

The informal dispute resolution process and appeal to the director include similar limitations on the scope of the dispute resolution process.  An informal dispute resolution request is limited to "a dispute regarding a decision made by the Department under the provisions of this chapter other than article 6" of chapter 55, while the appeal to the director is limited to issues raised in the informal process and requires "reasons why the decision does not comply with this chapter or is otherwise unreasonable."  (Tit. 22, §§ 69507.1, subd. (a), 69507.2, subd. (a).)  The resolution of the appeal to the director additionally notes that if relief is denied, the director must specify "the date by which the responsible entity must comply with the requirements of this chapter that were in dispute."  (Tit. 22, § 69507.2, subd. (c)(2).)  The remaining aspects of the dispute resolution process create a separate and unique process for "disputes regarding a decision made by the Department under article 6" of chapter 55, which covers final regulatory responses.  (Tit. 22, § 69507.3; see tit. 22, § 69506.)

Taken together, the court finds no basis to conclude that the regulations are intended to or do include provisions for resolving disputes arising under CEQA.  Rather,

---

[9]    These articles cover the process for identifying candidate chemicals, the petition process for identification and prioritization of chemicals and products, and trade secret protections.  (See tit. 22, §§ 69502, 69504, 69509.)

the regulations provide a dispute resolution process for only a limited set of issues that can arise under the broader regulatory scheme, specifically those issues that are most likely to directly impact responsible entities. Broader issues within the regulatory scheme, such as generating the list of chemicals necessary to identify product/chemical combinations or seeking trade secret protections, are separated and subjected to different procedures. Indeed, with trade secret decisions, the regulations authorize quick judicial review.

This structure supports the Department's assertion that CEQA issues are not subject to the regulatory dispute process. CEQA is a separate statutory scheme that contains its own process for exhausting administrative remedies. The dispute resolution process in the Safer Consumer Products regulations readily limit themselves to only a subset of potential issues that can arise under the various chapters included therein. It would be incongruent with that structure to conclude, as argued by appellants, that the phrase "a decision made by the Department under this chapter" covers ancillary issues arising under separate statutory schemes merely because they are potentially triggered by a decision under the Safer Consumer Products regulations. Accordingly, we reject appellants' claim that they were obligated to exhaust their administrative remedies under the Safer Consumer Products regulations in order to file their CEQA claim.

This determination does not resolve the statute of limitations dispute, however, as there still remains a question as to when the statute begins to run. Although not required to exhaust their administrative remedies under the Safer Consumer Products regulations, appellants note that they did raise issues under that process and that the regulations do not allow for final agency decision until that process is complete. (See tit. 22, §§ 69507.1, subd. (a) ["[i]f a request for informal dispute resolution is not received within thirty (30) days of the notice …, the Department's decision is final"], 69507.2, subd. (d) ["A decision issued under [§ 69507.2, subd.] (c) is the Department's final decision and is not subject to additional administrative dispute resolution."].) Appellants thus contend the

statute of limitations did not begin to run until their regulatory appeal was complete. We do not agree.

" 'The limitations period starts running on the date the project is approved by the public agency and is not retriggered on each subsequent date that the public agency takes some action toward implementing the project.' " (*Citizens for a Green San Mateo v. San Mateo County Community College Dist.* (2014) 226 Cal.App.4th 1572, 1594.) Under the CEQA Guidelines, "approval" "means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person. The exact date of approval of any project is a matter determined by each public agency according to its rules, regulations, and ordinances. Legislative action in regard to a project often constitutes approval." (Cal. Code Regs., tit. 14, § 15352, subd. (a).) " 'Generally speaking, an agency acts to approve a proposed course of action when it makes its earliest firm commitment to it, not when the final or last discretionary approval is made.' [Citation.] Approvals under CEQA, therefore, are not dependent on 'final' action by the lead agency, but by conduct detrimental to further fair environmental analysis." (*John R. Lawson Rock & Oil, Inc. v. State Air Resources Bd.*, *supra*, 20 Cal.App.5th at p. 99.)

In this case, the Department contends the project was approved no later than the point at which the regulatory packet was approved and filed by the Office of Administrative Law. While we do not agree that event marks the approval of the project, we do agree that the date could be no point later. By the time the Office of Administrative Law approved and filed the regulatory packet, the Department had publicly indicated its intent to list spray foam systems as a priority product, taken and responded to comments from the public on that decision, indicated that it believed the project was exempt from CEQA requirements, and released its final statement of reasons for the action. At that point, the Department had clearly made a firm commitment to its planned listing. Indeed, having claimed to have reviewed the project for CEQA issues

and found it exempt, then finalized the determination despite comments raising CEQA objections, there is no doubt that the Department had reached the point where its conduct was detrimental to further fair environmental analysis. At that point, the project had been thoroughly vetted and approved. The statute of limitations to raise a CEQA claim thus began to run no later than the point the Office of Administrative Law approved and filed the regulatory packet. As this date was April 26, 2018, and the CEQA claim was not filed until August 9, 2019, the claim was untimely under CEQA's 180-day statute of limitations.

Finally, we reject appellants' argument that the Department has changed its position from trial and should therefore be precluded from arguing the CEQA claim was untimely. The court has reviewed the Department's filings before the trial court and notes that the Department has consistently argued appellants' CEQA claim should be time-barred because it was not filed within 180 days of when the regulatory packet was approved and filed by the Office of Administrative Law. The trial court ultimately found that the CEQA claim was timely based on its belief that the Safer Consumer Products regulations applied to CEQA claims. However, this position does not appear to be tied to a position taken by the Department, but rather to appellants' direct argument in opposition that "before [appellants] could challenge [the Department]'s determination that the listing of [spray foam s]ystems is exempt from CEQA, they first were obligated to exhaust administrative remedies before [the Department]." Indeed, the Department specifically argued that "on its face, the [Safer Consumer Product] Regulations' exhaustion requirement, which applies only to 'a decision made by [the Department] under this chapter' does not apply to [appellant]s' CEQA claim." Given this argument history, we find no basis to preclude the Department's argument based on a change in position.

# DISPOSITION

The judgment is affirmed with respect to the first, second, and third causes of action seeking relief based on allegations the Department exceeded its authority through the listing determination and allegations the Department violated the APA. The judgment is reversed with respect to the fourth cause of action, under CEQA, and remanded with instructions that the trial court dismiss the claim as untimely.

Costs are awarded to the Department.


HILL, P. J.

WE CONCUR:


DETJEN, J.


PEÑA, J.

Filed 12/12/22

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| AMERICAN CHEMISTRY COUNCIL et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> DEPARTMENT OF TOXIC SUBSTANCES CONTROL et al., <br><br> Defendants and Appellants. | F082604 <br><br> (Fresno Super. Ct. No. 19CECG02938) <br><br><br> **ORDER GRANTING REQUEST FOR PUBLICATION** |

As the nonpublished opinion filed on November 18, 2022, in the above-entitled matter hereby meets the standards for publication specified in the California Rules of Court, rule 8.1105(c), it is ordered that the opinion be certified for publication in the Official Reports.


                                                                        HILL, P. J.

WE CONCUR:



DETJEN, J.



PEÑA, J.